**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Toledo Bar Assn. v. Yoder*, **Slip Opinion No. 2020-Ohio-4775.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2020-OHIO-4775

TOLEDO BAR ASSOCIATION *v*. YODER.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Toledo Bar Assn. v. Yoder*, Slip Opinion No. 2020-Ohio-4775.]**

*Attorneys—Misconduct—Violations of the Rules of Professional Conduct, including using means when representing a client that have no substantial purpose other than to embarrass, harass, delay, or burden a third person—Two-year suspension with six months conditionally stayed.*

(No. 2020-0228—Submitted June 2, 2020—Decided October 6, 2020.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2019-030.

_____

**Per Curiam.**

{¶ 1} Respondent, Thomas Alan Yoder, of Holland, Ohio, Attorney Registration No. 0020792, was admitted to the practice of law in Ohio in 1977.

{¶ 2} In a three-count amended complaint filed on September 27, 2019, relator, Toledo Bar Association, charged Yoder with multiple rule violations arising from (1) allegedly false statements he made regarding a magistrate,

opposing counsel, and opposing parties in two separate client matters and (2) threatening letters he sent to two witnesses whom he intended to call at his disciplinary proceeding.

{¶ 3} At a hearing, a three-member panel of the Board of Professional Conduct heard testimony from ten witnesses, received the parties' stipulations regarding the testimony of five additional witnesses in lieu of live testimony, and admitted more than 100 exhibits. Following the hearing, the panel unanimously dismissed six of the alleged rule violations. The panel issued a report finding that Yoder committed  many of the alleged rule violations, dismissing others, and recommending that he be suspended from the practice of law for two years, with one year conditionally stayed, with a condition for his reinstatement. The board adopted the panel's findings of fact, conclusions of law, and recommended sanction. Yoder objects, arguing that the board's findings of fact and misconduct are not supported by the record and that the recommended sanction is unduly harsh.

{¶ 4} On review, we find that the board's findings of fact and misconduct are supported by the record but that a more severe sanction is necessary to protect the public from Yoder's ongoing misconduct. We therefore overrule Yoder's objections and suspend him from the practice of law for two years with six months conditionally stayed. As a condition of reinstatement, Yoder shall be required to submit proof that he has been evaluated by the Ohio Lawyers Assistance Program ("OLAP") and that he has complied with any recommendations arising from that evaluation.

## MISCONDUCT

*Count One: The Child-Custody Matter*

{¶ 5} In 2015, Yoder represented maternal grandparents in their effort to obtain custody of their minor grandchildren in the Lucas County Court of Common Pleas, Juvenile Division. Codi Dowe, a cousin of the children's father,

sought to intervene in the proceeding and filed an emergency custody motion. The magistrate awarded temporary custody of the children to Dowe. Although the parties later agreed that the children would return to the grandparents' home, the litigation continued and relationships between the parties remained contentious.

### Yoder's False and Threatening Statements Regarding Dowe

{¶ 6} As the litigation wore on, Yoder made a number of false and threatening statements about Dowe in his written communications. In a letter to Dowe dated December 26, 2016, Yoder accused her of kidnapping the children by lying to his clients and stated that he would ask the children's guardian ad litem ("GAL") to examine children-services reports that "totally contradict[ed]" Dowe's "lies and fabrications" at the emergency custody hearing. In a January 10, 2017 letter to Dowe, he claimed that she had lied about him in a motion she had filed, told her not to "ever, ever lie about [him] again in court," and said that she was "out of touch with reality." Yoder also claimed in the letter that the court had appointed a GAL "to show that [Dowe had] some serious, serious mental problems, starting with [her] bogus claims about the [grandparents]."

{¶ 7} The next day, Dowe claimed in an e-mail to Yoder that he knew "exactly who raped" one of the children's relatives. In his reply e-mail, Yoder denied knowledge of any rape, again told Dowe she had "some serious, serious problems" and was "obviously delusional,"[1] and opined that it would be in the children's best interest "to not have anything to do with [her] and [her] mental problems."

{¶ 8} In a January 31, 2017 motion to terminate Dowe's visitation with the children, Yoder alleged that Dowe's unfounded allegations about the grandparents

---

1. Based on questions Yoder asked Dowe at his disciplinary hearing, the board found that Yoder had misconstrued Dowe's statement about the rape and leapt to the conclusion that she was blaming him for the rape and was accusing him of covering it up.

had caused great emotional harm to one of the children. He also reiterated his claims that Dowe was delusional, had serious mental problems, and needed professional help. And in May 2017 letters to the GAL, Yoder indicated that things "ha[d] gotten to be real personal between [the magistrate], Mrs. Dowe and myself" and claimed that Dowe had a "lack of ability to see realty [sic]."

{¶ 9} In an October 2017 letter, Yoder told Dowe, a nurse, that he had contemplated reporting Dowe's actions to the Ohio Board of Nursing; he also threatened her financial well-being. He later wrote to the Michigan and Ohio boards of nursing, aggressively urging them to investigate Dowe's mental condition and fitness to be a nurse—and sent copies of several of those letters to Dowe.

{¶ 10} For example, in April 2018, Yoder sent a letter to the Michigan Department of Licensing and Regulatory Affairs, accusing Dowe of lying at the emergency custody hearing, claiming that she was a "very, very troubled woman and in need of professional help," and stating that she "has some serious issues that very well could affect her functioning as a nurse." He claimed that Dowe had "leveled bizarre unfounded accusations" against him for two and a half years and had "refuse[d] to answer for her wild, insane allegations" that "only exist in her mind." He asked that the regulatory department conduct a hearing "to determine Mrs. Dowe's mental capacity" and suggested that "she may be a danger to her patients and those that work with her." He made additional allegations in a June 2018 letter to the department, claiming that Dowe had exhibited "bizarre visions of paranoia" and that a conversation that she reportedly had had with the children's GAL "only exists in her mind." Yoder made similar allegations against Dowe in a series of four letters he sent to the Ohio Board of Nursing between July 2018 and February 2019.

{¶ 11} The board found that Yoder had no factual basis to support the allegations he had asserted against Dowe. Although the board acknowledged that

Dowe may have been misinformed about background information in the underlying custody case, neither the panel nor any of the witnesses who knew Dowe found her to be anything other than sincere, intelligent, and believable. Indeed, the children's caseworker, the magistrate, and two GALs all testified that they had no concerns about Dowe's mental stability. Finding that Yoder's admitted goal was to remove Dowe from the children's lives and "get [her] off [his] butt" and that his allegations against her were unfounded, the board also determined that Yoder had reported Dowe to professional regulatory organizations solely to obtain an advantage in a civil matter.

### Yoder's False and Undignified Statements about the Magistrate

{¶ 12} In July 2017, Yoder objected to the magistrate's order regarding GAL fees and filed an affidavit of prejudice and bias against the magistrate. In that document, Yoder declared that the magistrate's ruling on Dowe's September 2015 emergency custody motion "was the most absolutely insane decision [he had] ever encountered in almost 40 years" and was not what "a normal, competent magistrate would have done."

{¶ 13} He accused the magistrate of lying about communications with a caseworker and the GAL regarding whether the children were in immediate danger at the grandparents' home. Yoder claimed that there was absolutely no basis for removing the children from the home and that at subsequent hearings, the magistrate personally attacked him instead of admitting that his actions with regard to the emergency custody motion were "100% wrong." Based on the magistrate's alleged lies, "incredible arrogance," "taunts, threats and lectures," and "vendetta" against him, Yoder suggested that the magistrate could not be objective and opined that either he should voluntarily remove himself from the case or the affidavit of prejudice and bias should proceed to a full hearing.

{¶ 14} We note that the magistrate testified that based on the evidence presented at the emergency custody hearing, he had found probable cause to

believe that the children were at some risk of imminent harm that warranted their removal from the grandparents' home. He stated that it seemed as though Yoder was blaming the court for interjecting itself into the family's life and that the law allows for anyone to file for custody of a child in this state. He explained that he runs a no-nonsense courtroom and that while he tolerates some grandstanding or dramatics, Yoder's personal attacks on Dowe had crossed the line. Although the magistrate did not believe that he had any bias, he agreed with the judge's August 2017 decision to reassign the case to ensure that the magistrate's increasing anger with Yoder's treatment of Dowe would not detract from what was in the best interest of the children.

{¶ 15} Even after the judge transferred the case to another magistrate, Yoder voiced his displeasure with the original magistrate in a court filing and in a letter to the Michigan Department of Licensing and Regulatory Affairs. And at his disciplinary hearing, Yoder testified that he stood by everything he had said about the magistrate.

{¶ 16} The panel found that there was a legitimate disagreement regarding the magistrate's findings in the emergency custody hearing, but the panel also found the magistrate's testimony at Yoder's disciplinary hearing to be "at all times completely credible." The board determined that Yoder had no reasonable basis in fact to allege that the magistrate had lied and that his statements about the magistrate's conduct were undignified or discourteous and degrading to the tribunal. *See Disciplinary Counsel v. Gardner*, 99 Ohio St.3d 416, 2003-Ohio-4048, 793 N.E.2d 425, ¶ 31 ("an attorney may be sanctioned for making accusations of judicial impropriety that a reasonable attorney would believe are false").

**Rule Violations**

{¶ 17} The board found that Yoder's conduct with respect to Dowe violated Prof.Cond.R. 1.2(e) (prohibiting a lawyer from presenting, participating

in presenting, or threatening to present professional-misconduct allegations solely to obtain an advantage in a civil matter) and 4.4(a) (prohibiting a lawyer in representing a client from using means that have no substantial purpose other than to embarrass, harass, delay, or burden a third person) and that his conduct with respect to the magistrate violated Prof.Cond.R. 3.3(a)(1) (prohibiting a lawyer from knowingly making a false statement of fact or law to a tribunal) and 3.5(a)(6) (prohibiting a lawyer from engaging in undignified or discourteous conduct that is degrading to a tribunal).

{¶ 18} In addition, the board found that Yoder's unsupported, untruthful, and derogatory statements regarding both the magistrate and Dowe violated Prof.Cond.R. 3.1 (prohibiting a lawyer from asserting or controverting an issue in a proceeding unless there is a basis in law or fact for doing so that is not frivolous), 4.1(a) (prohibiting a lawyer, while representing a client, from knowingly making a false statement of material fact or law to a third person), 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), and 8.4(d) (prohibiting a lawyer from engaging in conduct that is prejudicial to the administration of justice).

*Count Two: The Land-Contract Matter*

{¶ 19} In October 2010, Steven Thomas entered into a contract to purchase a home. Several months later, he discovered that the property was subject to a mortgage that had not been disclosed in the land contract. He became concerned that the mortgage was not being paid and that his payments were not being properly applied to cover the taxes and insurance on the property. Thomas and his wife, Lisa, retained attorney Fan Zhang to represent them, and the seller engaged Yoder to represent him.

{¶ 20} Thereafter, in two letters to Yoder, Zhang advised him that the Thomases would file suit if Yoder did not provide certain documents. Yoder responded in writing, stating, "I don't know who you think you are, but do not

ever threaten me or doubt when I tell you something," and "Do not, I repeat, do not ever threaten me or any other normal attorney with lawsuits or contempt of court filings and tell us what to do." On at least two occasions, he accused Zhang in writing of "churning" the Thomases to increase his legal fees. During disciplinary proceedings, Yoder suggested in a letter to relator that Zhang "saw a chance to rip [the Thomases] off."

{¶ 21} In July 2012, the Thomases filed a complaint against the seller in the Lucas County Court of Common Pleas. In his answer, Yoder stated that "Plaintiff's counsel apparently does not understand the land contract process." In a letter proposing mediation, Yoder told Zhang, "Since you and I have trouble communicating, may I suggest that you also bring another member of your firm to the mediation? It is apparent in my humble opinion that you do not understand the lawsuit that you filed." He later wrote to Zhang, stating: "As I have said in the past, you are a complete idiot! For over two (2) years, I have asked you to get some help about your misunderstanding about a vendor being able to transfer title to real estate. However you are to [sic] stupid to know how stupid you are and your [recent letters] prove that once again." In the same letter, he wrote, "[Y]our letter of January 5, 2015 was so stupid, I sent it back to you as I didn't want it in my file," and he closed the letter with "No more idiotic letters!!!"

{¶ 22} Zhang stopped representing the Thomases in March 2017. Several months later, Yoder sent the Thomases a note stating, "Zhang lied to you so that he could file the lawsuit. * * * You paid him for absolutely nothing! I have tried to make him understand, but he is unable to grasp the concept." In a 2018 letter to the Thomases' new counsel, Yoder said that Lisa Thomas is a "very ignorant, troubled woman," "a liar," and "an idiot." He further opined that Zhang was a "mentally ill attorney advising an idiot" and stated that "[n]ether [sic] has understood what is going on from the start." He claimed that he had "tried to carry on an intelligent conversations [sic] with [Zhang], but like everyone else

[Yoder] had no luck." In addition, he asserted that his problems over the prior seven years all related back to "Zhang and his inability to understand basic principles of real estate law and his desire to mislead the Thomas' [sic] to churn them for attorney's fees."

{¶ 23} The board found that Yoder's assertions that Lisa Thomas is a liar, that Zhang was mentally incompetent, and that Zhang had lied to the Thomases to charge an unreasonable fee were without basis in fact or law and were frivolous. In addition, the board noted that while Steven Thomas's lawsuit was pending in the Lucas County Court of Common Pleas, Yoder filed a complaint against Thomas in the Sylvania Municipal Court. The municipal court granted Thomas's unopposed motion to dismiss, on the ground that the complaint raised the same facts and issues that were pending in the common pleas court case. The common pleas court later issued a decision in Thomas's favor, and that judgment was affirmed on appeal. The board found that Yoder's municipal-court filing was both frivolous and prejudicial to the administration of justice.

{¶ 24} Based on Yoder's conduct in the Thomas matter, the board found that he violated Prof.Cond.R. 3.1, 4.1(a), 4.4(a), and 8.4(d).

*Count Three: Letters to Witnesses in the Disciplinary Proceeding*

{¶ 25} In a September 2019 letter to Dowe's father, Yoder stated his intention to subpoena both of Dowe's parents to testify at Yoder's upcoming disciplinary hearing. Yoder explained, "Your daughter is scheduled to appear and will answer my questions under oath regarding her conduct as it relates to the * * * children. These include intentionally lying to the court and intentionally violating court orders." After explaining that Dowe had previously stated that her parents had transported the children following Dowe's visitation—contrary to the grandparents' claims—Yoder stated, "Since you will put [sic] under oath and subject [sic] to the laws of perjury should you lie, may I respectfully suggest that you retain an attorney to advise you as to the ramification of your testimony?"

{¶ 26} In September 2019, Yoder sent the Thomases a similar letter stating that he had filed a response to Lisa Thomas's grievance and had attached documentation "to show that [the Thomases had] consistently lied about [his] conduct." In the next sentence, he suggested that the Thomases contact an attorney "to advise [them] about [their] rights and obligations, as [they would] be under oath at the hearing."

{¶ 27} The board found that these letters served no substantial purpose other than to strike fear in, embarrass, harass, or burden the recipients with the cost of hiring counsel to address Yoder's inappropriate threats and innuendo. Consequently, the board found that Yoder's conduct violated Prof.Cond.R. 4.4(a).

## RECOMMENDED SANCTION

{¶ 28} When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

{¶ 29} As aggravating factors, the board found that Yoder had engaged in a pattern of misconduct, committed multiple offenses, and refused to acknowledge the wrongful nature of his conduct. *See* Gov.Bar R. V(13)(B)(3), (4), and (7). The board also found that Yoder had caused harm to the vulnerable victims of his misconduct by creating fear, threatening Dowe's livelihood, unnecessarily increasing the costs in what should have been uncomplicated legal matters, and ultimately causing Dowe to withdraw from the underlying custody case. *See* Gov.Bar R. V(13)(B)(8). The board also noted that Yoder had made numerous inappropriate statements about relator's counsel. For example, in his posthearing brief, he stated that relator "will sink to any depth to trump up anything against me" and that relator's counsel "had absolutely no clue as to any of the facts he has alleged in his complaint." He further suggested that counsel "*has never read any of the pleading, or Emails nor has he looked at any of the*

*exhibits before attacking, [Yoder's] integrity, competency and ethics*" (emphasis sic) and that relator had a vendetta against him.

{¶ 30} As for mitigation, the board found that Yoder has no prior discipline and that he had made full and free disclosure to the board and cooperated in the disciplinary proceedings—though the board noted that Yoder had demonstrated a high degree of obduracy and had remained committed to the proposition that his actions were unassailable because decisions made in the underlying cases were unjust and he was speaking the truth. *See* Gov.Bar R. V(13)(C)(1) and (4).

{¶ 31} In determining the appropriate sanction to recommend for Yoder's misconduct, the board began with the proposition that when an attorney has made material misrepresentations to a court and engaged in a course of conduct that results in a finding that the attorney has violated rules prohibiting dishonesty, fraud, deceit, or misrepresentation, "the attorney will be actually suspended from the practice of law for an appropriate period of time." *Disciplinary Counsel v. Fowerbaugh*, 74 Ohio St.3d 187, 190, 658 N.E.2d 237 (1995); *see also Cleveland Bar Assn. v. Herzog*, 87 Ohio St.3d 215, 217, 718 N.E.2d 1274 (1999) ("We will not allow attorneys who lie to courts to continue practicing law without interruption").

{¶ 32} The board also considered cases in which we imposed sanctions ranging from a fully stayed suspension to an indefinite suspension for similar rule violations involving the making of false statements to courts and others and/or inappropriate threats of legal action. For example, in *Disciplinary Counsel v. Harmon*, 158 Ohio St.3d 248, 2019-Ohio-4171, 141 N.E.3d 142, we imposed a fully stayed two-year suspension on an attorney with an unblemished 40-year career who falsely informed a magistrate that his elderly client (who was also a close personal friend) had been kidnapped and later filed a frivolous lawsuit in an attempt to collect his fees. The board distinguished the facts of this case from

*Harmon* on the ground that none of Yoder's acts of misconduct were taken in the heat and passion of the moment. Instead of expressing his disagreements on the merits of the custody and land-contract cases at issue in an ethical fashion, Yoder engaged in a deliberate pattern of false and inappropriate written communications regarding four people over several years.

{¶ 33} In *Dayton Bar Association v. Swift*, 142 Ohio St.3d 476, 2014-Ohio-4835, 33 N.E.3d 1, we imposed a two-year suspension, with the second year conditionally stayed, on an attorney who grossly overbilled for the work he had performed and made false statements to a court and others—misconduct that, like Yoder's misconduct, violated Prof.Cond.R. 3.3(a)(1), 4.1(a), 8.4(c), and 8.4(d).

{¶ 34} And in *Disciplinary Counsel v. Pullins*, 127 Ohio St.3d 436, 2010-Ohio-6241, 940 N.E.2d 952, we indefinitely suspended an attorney who, among other things, had made false and disrespectful statements regarding two judges in affidavits of disqualification, accused two judges and a prosecutor of engaging in ex parte communications about pending cases, issued a subpoena to the wife of the judge presiding over his client's case in an attempt to disqualify the judge, and showed no remorse for his conduct. Expressing concern that underlying mental-health issues may have contributed to Pullins's misconduct, we conditioned his reinstatement on the submission of proof to a reasonable degree of medical certainty that he was mentally fit to return to the competent, professional, and ethical practice of law.

{¶ 35} Given the sheer volume of Yoder's false statements that were degrading to the tribunal and were intended to embarrass, harass, and unnecessarily burden opposing counsel and parties, the board concluded that Yoder's misconduct warrants actual time out from the practice of law. After weighing the applicable aggravating and mitigating factors and precedent, the board recommends that Yoder be suspended from the practice of law for two years with one year stayed on the condition that he refrain from further

misconduct. In addition, the board recommends that his reinstatement be conditioned on proof that he has submitted to an OLAP evaluation and complied with any recommendations arising from that evaluation.

{¶ 36} In 112 pages of rambling objections, Yoder argues that the Dowe and Thomas cases were wrongly decided and that the merits of those cases are highly relevant to the resolution of this disciplinary matter. But the issue before us is not whether Yoder's positions or the trial courts' decisions in those cases were correct. The issue is how Yoder conducted himself in contentious litigation and in the face of adverse rulings.

{¶ 37} In his objections, Yoder categorically denies that he has committed any ethical violations. He maintains that all his statements about the magistrate and the parties to the Dowe and Thomas cases and their counsel are true and that nearly everyone involved in those cases and this disciplinary proceeding has lied or exhibited bias against him. He further contends that the allegedly erroneous rulings of the courts and the allegedly poor treatment he received from others in the underlying litigation somehow justify his "bad attitude" and harsh characterizations of others.

{¶ 38} In this case, in addition to the evidence presented at Yoder's disciplinary hearing, the panel reviewed Yoder's court filings and extensive correspondence in the underlying litigation. The panel heard Yoder's testimony and the conflicting evidence from witnesses who were involved in the underlying custody litigation, including Dowe, the GALs, a case worker, the magistrate, and the trial-court judge in the custody proceedings. Furthermore, the panel had the opportunity to assess Lisa Thomas's credibility as she testified regarding her interactions with Yoder throughout the course of the land-contract case. The findings of fact and misconduct set forth above plainly demonstrate that the panel found the testimony of those witnesses to be more credible than that of Yoder.

**{¶ 39}** We typically defer to the panel's credibility determinations unless the record weighs heavily against those findings because the panel has the opportunity to observe the witnesses firsthand. *Cincinnati Bar Assn. v. Statzer*, 101 Ohio St.3d 14, 2003-Ohio-6649, 800 N.E.2d 1117, ¶ 8, citing *Cleveland Bar Assn. v. Cleary*, 93 Ohio St.3d 191, 198, 754 N.E.2d 235 (2001). In this case, the record does not weigh heavily against the board's credibility determinations. On the contrary, our independent review of the record confirms that the findings of fact and misconduct set forth above are supported by clear and convincing evidence.

**{¶ 40}** Indeed, the record demonstrates that over the last eight years, Yoder has been unable or unwilling to address his frustrations in the underlying cases—be they adverse court rulings, perceived criticism of his own conduct, or his own perceptions that others are performing incompetently—in a concise, rational, and professional manner. Instead, he has lashed out at a magistrate in an undignified and discourteous fashion and degraded the tribunal for granting what he considered to be an erroneous and absurd emergency custody order—though he never moved the court to set aside the order. He has also made numerous false and inflammatory statements about the magistrate, Dowe, Lisa Thomas, and Zhang in correspondence with them and with others, threatened Dowe's financial well-being, and made false and derogatory statements to professional-licensing boards about her conduct, veracity, and mental health for the sole purpose of gaining an advantage in the custody case. Based on the foregoing, we overrule Yoder's objections to the board's findings of fact and misconduct and we adopt as our own the board's findings as set forth above.

**{¶ 41}** Yoder's final objection is that the board's recommended sanction is "unduly harsh" because it is based on "totally fabricated facts" and "unsubstantiated conclusions." But we have already found that the board's findings of fact and misconduct are supported by clear and convincing evidence,

and Yoder has neither offered any precedent to support his claim nor suggested any alternative sanction. The board's recommended sanction of a two-year suspension, with one year conditionally stayed, might be an appropriate sanction for Yoder's extensive pattern of false allegations, his repeated insistence that he stands by every word of those allegations, and his refusal to acknowledge that he has done anything wrong—if his misconduct had stopped there. But Yoder has continued to levy false and inflammatory accusations with little or no basis in fact against anyone who disagrees with him—including relator's counsel and the member of the board responsible for drafting the report in this disciplinary proceeding. Consequently, we believe that a more severe sanction is necessary to protect the public and to convey that Yoder's conduct will not be tolerated going forward. We therefore suspend Yoder from the practice of law for two years with the final six months conditionally stayed, and we agree that his reinstatement to the practice of law shall be conditioned on his completion of an OLAP evaluation and compliance with any recommendations arising therefrom.

{¶ 42} Accordingly, Thomas Alan Yoder is suspended from the practice of law for two years with the final six months stayed on the condition that he engage in no further misconduct. If Yoder violates the condition of the stay, the stay will be lifted and he will serve the entire two-year suspension. In addition to the requirements for reinstatement set forth in Gov.Bar R. V(24), Yoder shall provide proof that he has submitted to an evaluation by OLAP and that he has complied with any recommendations arising from that evaluation. Costs are taxed to Yoder.

Judgment accordingly.

O'CONNOR, C.J., and KENNEDY, FRENCH, FISCHER, DEWINE, DONNELLY, and STEWART, JJ., concur.

————————————

Patricia B. Fugée; Robert J. Bahret; and Joseph P. Dawson, Bar Counsel, for relator.

Thomas A. Yoder, pro se.

_____